**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES A. RUPERT, WILLIAM E. TRAVIS, KAREN A. TRAVIS, and BRYAN MARTIN, *on behalf of themselves and all others similarly situated*, | ) ) ) ) ) | Civil Action No. 2:21-cv-1281 Magistrate Judge Patricia L. Dodge |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RANGE RESOURCES – APPALACHIA, LLC, | ) ) ) | |
| Defendant. | ) ) | |

**<u>MEMORANDUM OPINION</u>**[1]

Pending before the Court is Plaintiffs' Motion for Class Certification (ECF No. 100.) For the following reasons, the motion will be granted and a modified class definition will be adopted.

**I.   <u>Relevant Procedural History</u>**

Plaintiffs James A. Rupert, William E. Travis, Karen A. Travis, and Bryan Martin (collectively "Plaintiffs") commenced this class action on September 24, 2021 against Range Resources – Appalachia, LLC ("Range") and its corporate parent Range Resources Corp ("Range Corp") (collectively "Defendants"). (ECF No. 1.) After Defendants moved to dismiss (ECF Nos. 14, 16), Plaintiffs amended their complaint, asserting claims for breach of contract, a declaratory judgment, and an accounting. (ECF No. 29.)

On November 29, 2021, Plaintiffs moved for a temporary restraining order or preliminary injunction, seeking to enjoin Defendants from issuing reimbursement payments for royalties owed

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. The undersigned therefore has the authority to decide dispositive motions and enter final judgment.

to Plaintiffs and the putative class members. (ECF No. 32.) The Court denied the motion, finding that although Plaintiffs were likely to succeed on the merits, they failed to show that receiving at least some portion of the payments they were owed would result in irreparable harm. (*Id.*) The Court also noted that "it is abundantly clear from the parties' representations to the Court during a video conference that an active dispute remains regarding whether Defendants will have paid Plaintiffs all monies to which they are entitled once these reimbursements are mailed." (ECF No. 45 at 3.)

On November 30, 2021, Plaintiffs moved for class certification. (ECF Nos. 36, 37.) Defendants jointly filed a brief in opposition (ECF No. 47), to which Plaintiffs replied and filed additional exhibits. (ECF No. 55.) Then, on December 2, 2021, Range moved to dismiss for a second time under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (ECF Nos. 41, 42.) That same day, Range Corp also moved to dismiss under Rule 12(b)(6). (ECF Nos. 39, 40.)

On May 26, 2022, the Court issued a Memorandum Opinion disposing of all three motions. (ECF No. 59). The Court denied Range's motion to dismiss (ECF No. 62) and granted Range Corp's motion to dismiss without prejudice (ECF No. 61). Plaintiffs were given leave to amend the claims against Range Corp but were warned that it would likely be their last opportunity to do so. (*Id.*) In light of Plaintiffs' potential amendment, the motion for class certification was denied without prejudice to renew as appropriate later. (ECF No. 60.)

On July 11, 2022, Plaintiffs filed their Second Amended Complaint. (ECF No. 64.) In response, Range answered (ECF No. 67) and Range Corp again moved to dismiss (ECF No. 68). Following a full round of briefing on the motion (ECF Nos. 69, 73, 77, 80), Plaintiffs filed a Stipulation of Dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) dismissing without prejudice

all claims against Range Corp.[2] (ECF No. 81.)

On February 3, 2023, the Court issued an Amended Case Management Order setting forth various deadlines for discovery, expert disclosures, and the filing of Plaintiffs' renewed motion for class certification. (ECF No. 91.) After several additional amendments to the Case Management Order (ECF Nos. 93, 95, 97), Plaintiffs moved for class certification under Fed. R. Civ. P. 23(a) and 23(b)(3) on January 12, 2024. (ECF No. 100.) Once the motion had been fully briefed (ECF Nos. 101, 102, 106, 110, 111), the Court held oral argument by video conference on April 4, 2024. (ECF No. 113.) Plaintiffs' motion is now ripe for consideration.

## II.   **Factual Background**

Plaintiffs are seeking certification of a class as to their breach of contract claim. Each of the Plaintiffs is a lessor under oil and gas agreements ("Plaintiffs' Leases") entered into with Range, an operator of oil and natural gas wells across southwestern Pennsylvania.[3] (ECF No. 64 ¶ 17.)

Range operates wells drilled pursuant to Plaintiffs' Leases to produce and capture natural gas that contains entrained natural gas liquid products ("NGLs"). The natural gas produced from these wells is collected and delivered to a gathering system operated by a third party. This third party processes the natural gas, separates the entrained NGLs, and fractionates the NGLs into their constituent products. The processed product is then transported to various markets where the residue natural gas and NGLs are sold to third parties. (ECF No. 106 at 2.)

---

[2]  The remaining claims against Range are breach of contract (Count I), declaratory judgment (Count VI), and an accounting (Count VII). However, only the breach of contract claim is relevant to the disposition of Plaintiffs' certification motion.

[3]  On November 22, 2013, Range entered into oil and gas leases with Plaintiffs James A. Rupert (ECF Nos. 64-1, 64-2, 64-3), William E. Travis and Karen A. Travis (ECF No. 64-4), and Bryan E. Martin (ECF No. 64-5).

Range, as lessee, has an obligation to pay royalties to Plaintiffs on natural gas and NGLs produced from the wells. (ECF No. 64 ¶ 18.) Each of Plaintiffs' Leases contains the following royalty language:

> **_Royalty_** To pay Lessor as Royalty, less Lessor's proportionate share of all taxes, assessments and adjustments on production from the Leasehold as follows: . . . 2. GAS: To pay Lessor an amount equal to **18.25%** of the net revenue realized by Lessee for all gas, NGL, and the constituents thereof produced and marketed from the Leasehold., [sic] Lessee may withhold Royalty payment until such time as the total withheld exceeds **fifty dollars ($50.00)**.
> . . .
>
> (B) Natural Gas, NGL, and related constituents Royalty Calculation. All royalty for natural gas, NGLs, and the constituents thereof produced by the wells payable under this Addendum for any Accounting Period shall be calculated using the actual purchase price paid by the First Purchaser of such products reduced by not more than the pro rata share of the actual Post Production Costs incurred during such period, but in no event shall the Post Production Costs exceed $0.80 per MMBTU.

(ECF Nos. 64-1 at 9-10; 64-4 at 6-7; 64-5 at 10-11.)

Additionally, Plaintiffs' Leases contain the following definitions:

> 'First Purchaser' shall mean the first arms-length purchaser of oil or natural gas produced or NGL derived from natural gas produced from a well.
>
> . . .
>
> 'Post Production Costs' shall mean and include all items of current expense, including depreciation, incurred in the sale of natural gas after oil or gas is produced at the wellhead but before the first point of sale to a First Purchaser, including but not limited to the cost of gathering, dehydration, compression, processing, transportation and arm[']s-length marketing of such gas. The term Post Production Costs does not include any Production Costs.

(ECF Nos. 64-1 at 10; 64-4 at 7; 64-5 at 11.)

Prior to the October 2021 production month, as Range admits, it deducted Plaintiffs' pro rata share of <u>all</u> NGL-related post-production costs rather than capping deductions at $0.80 per MMBTU ("the Cap"), as required by Plaintiffs' Leases. As explained by Range:

Range pays Plaintiffs production royalties pursuant to the Lease on the residue natural gas and the NGLs that are sold. For royalties paid on the residue natural gas, Range deducts Plaintiffs' pro-rata share of post-production costs up to $0.80 per MMBTU. For royalties paid on NGLs associated with Plaintiffs' Leases until the end of production month September, 2021, Range deducted Plaintiffs' pro-rata share of all post-production costs. For royalties paid on NGLs associated with the Plaintiffs' Leases starting in the production month of October, 2021, Range only deducts Plaintiffs' pro-rata share of post-production costs up to $0.80 per MMBTU, converted to a per barrel equivalent.

(ECF No. 106 at 3.) Thus, Range acknowledges that until the October 2021 production month, it routinely underpaid Plaintiffs' NGL royalty in contravention of the terms of the Leases.

Each of Plaintiffs' Leases also contain the same notice provision:

19. **NOTICE**: In the event that any default or alleged default by LESSEE in the performance of any of its obligations under this Lease, LESSOR shall notify LESSEE in writing setting out specifically in what respects LESSEE has breached this Lease. LESSEE shall then have sixty (60) days after receipt of said notice within which to dispute such alleged default or to meet or commence to meet all or any part of the default alleged by LESSOR. The service of said notice shall be precedent to bringing of any action by LESSOR arising out of or related to the Lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after the service of such notice on the LESSEE. Neither the service of said notice nor the doing of any acts by LESSEE aimed to meet all of any part of the alleged breaches shall be deemed an admission or presumption that LESSEE has failed to perform any of its obligations under the Lease. All notice to LESSEE provided for in this Lease shall be sent by certified mail return receipt requested to LESSEE and LESSEE's address provided on Page One (1) of this Lease.

(ECF Nos. 64-1 at 6; 64-4 at 3; 64-5 at 7.)

In December 2018, Plaintiff James A. Rupert ("Rupert") sent Range a certified letter, through counsel, that accused Range of miscalculating Rupert's royalties. (ECF No. 64-6.) The letter alleged several ways in which Range was deducting costs in excess of the Cap, resulting in the routine underpayment of Rupert's royalties.[4] Rupert's letter stated that he "believes, and

---

[4] Rupert alleged that Range miscalculated royalties by: (1) improperly deducting post production costs in excess of $0.80 per MMBTU; (2) miscalculating the gross royalty that Range owned using a point-of-sale rather than wellhead volume; (3) failing to account for Range's share of the value of the sale of NGLs

therefore gives notice to Range Resources, that Range Resources has committed the above-described breaches in every lease with similarly situated lessors containing the Cap under which Range Resources is producing or purporting to produce oil and/or natural gas. This correspondence shall serve as Notice for all those lessors, as well." (*Id.*)

Range investigated the accusations and determined that in fact, it had been deducting costs in excess of the Cap from Rupert's royalty. (Black Decl., ECF No. 106-1 ¶¶ 56-57.) Range corrected its error and refunded Rupert for the previous deductions associated with residue natural gas but did not make any changes to the deduction of post-production costs associated with NGLs. (*Id.* ¶¶ 58-59.)

After Plaintiffs filed this class action in September 2021, Range reviewed its business records to identify members of the putative class as defined in the Complaint. In November 2021, Range identified a group of leases with royalty language identical to that of Plaintiffs (the "$.80 Leases") and a group with substantially similar royalty language (the "Alternative $.80 Leases"). (Black Decl., ECF No. 106-1 ¶¶ 19-20.) Range changed its royalty calculation with respect to all identified leases such that post-production costs for NGLs produced were capped at $0.80 per MMBTU beginning with the November 2021 royalty month. (*Id.* ¶ 25.)

In December 2021, Range issued reimbursement checks for past over deductions to royalties paid under Plaintiffs' Leases, $.80 Leases, and Alternative $.80 Leases. (*Id.* ¶ 28.) The royalty payment period was calculated by applying Pennsylvania's four-year statute of limitations

---

extracted from the raw natural gas; (4) failing to account for Range's share of the value of the natural gas consumed in removing entrained NGLs before the sale of the residue gas; (5) improperly deducting "Firm Capacity" charges for fees paid to pipeline capacity commitments, which were never accounted for; (6) failing to report Range's royalty share of the MMBTU attributable to NGLs resulting in improper "Processing" charge deductions; and (7) improperly deducting "Transportation" charges. (ECF No. 64-6.)

on breach of contract claims, with the filing of the Complaint serving as the trigger date. Thus, the reimbursement covered royalty underpayments spanning September 2017 until September 2021. (*Id.* ¶ 26.)

In July 2022, Range discovered another group of leases that capped the deduction of post-production costs at $0.75 per MMBTU (the "$.75 Leases") in which it had also deducted costs in excess of the Cap. (*Id.* ¶¶ 32-33.) The royalty payments due under the $.75 Leases are nearly identical to Plaintiffs' Leases aside from the $0.05 Cap difference. Range issued reimbursements to the lessors of the $.75 Leases in July 2022 for the production months of June 2018 to May 2022. (*Id.* ¶ 33.) The reimbursement period for the $.75 Leases was calculated by applying the same four-year statute of limitations but used Range's July 2022 date of discovery as the trigger.

In 2023, Range identified one lease that contains $0.72 per MMBTU language (the "$.72 Lease"). (*Id.* ¶ 36.) The lessor of the $.72 Lease was also issued a reimbursement payment using the same method to calculate the reimbursement period as the $.75 Leases.[5]

In total, Plaintiffs' class list consists of one hundred twenty-one (121) $.80 Leases; fifty-one (51) Alternative $.80 Leases; thirty-one (31) $.75 Leases; and one (1) $.72 Lease. (*Id.* ¶ 37.) All of the $.80 and Alternative $.80 Leases are subject to a notice provision that is at least substantially similar to the one found in Plaintiffs Leases. None of the $.75 Leases or the lone $.72 Lease, however, require that notice be given before commencing the type of claim involved here. (*Id.* ¶¶ 49-54.)

Finally, fifty-four (54) of the leases contain some type of arbitration provision, including all thirty-one of the $.75 Leases. The arbitration clauses generally appear in one of three forms

---

[5] For this reason, references to "the $.75 Leases" shall also include the lone $.72 Lease.

with varying levels of specificity. (*Id.* ¶¶ 40-45.)

## III.   <u>Legal Standard</u>

Every putative class action "must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  Rule 23 is not a pleading standard; each requirement must be "satisf[ied] through evidentiary proof" after a "rigorous analysis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  In conducting its inquiry, a district court must assess "the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial," which may require the district court to "delve beyond the pleadings." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312, 316 (3d Cir. 2008) (internal quotation and citations omitted).  The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence. *See Marcus*, 687 F.3d at 591.

## IV.   <u>Discussion</u>[6]

### A.  Modification of Class Definition

As part of an analysis under Rule 23, the Court must first "define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). In doing so, the Court must set forth "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Wachtel v. Guardian Life Ins. of Am.*, 453 F.3d 173, 187-88 (3d Cir.

---

[6] Range opposes class certification. However, in its brief and at oral argument, while expressly reserving all of its rights to dispute the merit of the claims and damages sought classwide and on an individualized basis, Range alternatively represented that it does not contest certification of the $.80 and Alternative $.80 Leases as to the breach of contract claim solely for payment of two additional months of reimbursements and prejudgment interest. (ECF No. 106 at 24). As the majority of the disputed issues relate to the $.75 Leases, the analysis in this Opinion will focus on these issues except as otherwise noted.

2006).

As to only their breach of contract claim, Plaintiffs originally moved to certify a class consisting of:

> Persons and entities, including their respective successors and assigns, to whom Range, since September 1, 2017, has paid royalties, or has an obligation to pay royalties, under oil and gas leases which the lessee's interests and obligations came to be owned by Range on or after October 13, 2010, and that preclude Range from deducting post-production costs from its royalty calculation on natural gas, NGLs, and related constituents in excess of $0.80 per MMBTU.

> Excluded from the Class are: (1) Range, its current officers, and employees; and (2) any person whose royalty underpayment claim against Range is subject to a binding arbitration provision.

(ECF No. 102 at 7) (the "original class definition").[7]

After careful consideration, the Court declines to adopt the original class definition. "Formulating a 'workable class definition' generally requires 'ongoing refinement and give-and-take.'" *Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581, 591 (W.D. Pa. 2022) (quoting *In re Monumental Life Ins.*, 365 F.3d 408, 414 (5th Cir. 2004)). District courts are not bound by a plaintiff's proposed class definition and instead have "the authority to limit or modify class definitions in order to provide the precision needed for class certification." *Chedwick v. Univ. Pittsburgh Med. Ctr.*, 263 F.R.D. 269, 272 (W.D. Pa. 2009); *see also Shelton v. Bedsoe*, 775 F.3d 554, 564 (3d Cir. 2015) ("Courts have discretionary authority to 'reshape the boundaries and composition of the class,'" so long as doing so "will better serve the purposes of Rule 23 and the underlying policies of the substantive law than would denying certification altogether." (citation omitted)); *Marcus*, 687 F.3d at 594 (directing the district court to "adjust[] the class definition as

---

[7]  In their Reply Brief (ECF No. 110), Plaintiffs proposed an alternative class definition that, as discussed herein, expressly included the $.75 and $.72 Leases and addresses wells for which there has been no production.

needed" upon remand).

While opposing certification, Range contends that the Court must, at a minimum, modify Plaintiffs' proposed class definition.  First, Range notes that there are some leases that may fall within the class definition but do not have any NGL production.[8] These lessors would not be entitled to any type of reimbursement or prejudgment interest for underpayment of NGL royalties since no NGLs were ever produced by their associated wells. (ECF No. 106 at 17-18.) Plaintiffs concede and suggest modifying the class definition to exclude any leases covering non-producing or "dry" wells. (ECF No. 110 at 13-14.) The Court agrees that this minor modification is a suitable resolution of this issue.

Next, Range argues that Plaintiffs' use of the phrase "in excess of $0.80 per MMBTU" is insufficient to encompass the $.75 Leases. (ECF No. 106 at 18-19.) Plaintiffs argue that because $0.75 and $0.72 are numerically less than $0.80, the definition as proposed is sufficient. (ECF No. 110 at 12.) Range agreed at oral argument, however, that specifying the Cap amounts in the definition would alleviate this concern. Thus, the Court will also modify the original class definition to specify exact Cap values – i.e., $0.80, $0.75, and $0.72 – encompassed in the class.

Finally, Range asks that the Court eliminate the term "binding" from the arbitration exclusion. (ECF No. 106 at 20.) While the presence of arbitration clauses undoubtedly will be a significant issue at a subsequent point in this proceeding, the Court declines to modify this term for purposes of the present analysis, as discussed herein.

---

[8]  The parties agreed at oral argument that the wells covered under these leases have never and likely will never produce NGLs.

The Court will therefore adopt the following modified class definition:

Persons and entities, including their respective successors and assigns, to whom Range, since September 1, 2017, has paid royalties on the production of NGLs under oil and gas leases which the lessee's interests and obligations came to be owned by Range on or after October 13, 2010, and that preclude Range from deducting post-production costs from its royalty calculation on natural gas, NGLs, and related constituents in excess of $0.80, $0.75, or $0.72 per MMBTU.

Excluded from the Class are: (1) Range, its current officers, and employees; and (2) any person whose royalty underpayment claim against Range is subject to a binding arbitration provision.

Having more precisely defined the class at issue, the Court will now proceed with its analysis under Rule 23(a) and Rule 23(b)(3).

## B. **Rule 23(a) Prerequisites**

To meet the requirements of Rule 23(a):

(1) the class must be so numerous that joinder of all members is impracticable (numerosity); (2) there must be questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality); and (4) the named plaintiffs must fairly and adequately protect the interests of the class (adequacy of representation, or simply adequacy)

*In re Lamictal Dir. Purchaser Antitrust Litig.*, 957 F.3d 184, 190 (3d Cir. 2020) (quoting *Marcus*, 687 F.3d at 590-91). The Court addresses each of these elements in turn.

### 1. *Numerosity*

Rule 23(a)(1) requires that a purported class be "so numerous that joinder of all members is impracticable[.]" Fed R. Civ. P. 23(a)(1). The Third Circuit has explained that "although 'no minimum number of plaintiffs is required to maintain a suit as a class action,' a plaintiff in this circuit can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing 'that the potential number of plaintiffs exceeds 40.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d

467, 486 (3d Cir. 2018) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

Plaintiffs have identified 205 leases attached to 212 royalty owners who meet the class definition (ECF No. 102 at 17), which is well above the threshold required by the Third Circuit. Range does not contest that Plaintiffs can satisfy the numerosity requirement even if the $.75 and $.72 Leases were excluded. Accordingly, the Court finds that the numerosity requirement is satisfied.

### 2.   *Commonality*

Plaintiffs argue that there are several common questions of law and fact capable of generating classwide answers, including: (1) whether Range has an obligation under the 205 class leases to pay royalties based on actual prices received on the sale of the NGLs at the point of sale to third-party purchasers in arm's-length transactions; (2) whether Range breached the Leases by failing to calculate and pay royalties based on the actual gross prices received from NGLs produced and sold to third-party purchasers; (3) whether Range breached the Leases by deducting various post-production costs from the sale price of NGLs in excess of the respective Caps when calculating and paying royalties, and (4) whether Range has an obligation to pay prejudgment interest on its royalty underpayments. (ECF No. 102 at 20-21.)

Range argues, however, that Plaintiffs' claims based on an "arms-length theory" cannot be certified because not all leases contain "first arms length purchaser language."[9] (ECF No. 106 at 28-30.) According to Range, Plaintiffs' claim originates from "Plaintiffs' generic allegation that

---

[9]  Range argues that "[m]aterial differences in the lease language negate predominance." (ECF No. 106 at 28.) Because "[t]he 'predominance' requirement of Rule 23(b)(3) incorporates the Rule's 'commonality' requirement[,]" *Walney v. SWEPI LP*, 2019 WL 1436938, at *4 (W.D. Pa. Mar. 31, 2019), "it is appropriate to consider the predominance element along with the commonality element." *Salvatora v. XTO Energy Inc.*, 2023 WL 4137306, at *12 (W.D. Pa. June 2, 2023).

Range failed to calculate royalties on the 'sales prices received at the point of Range's sale of NGLs from the first arms' length purchaser….'" (*Id.* at 28) (alteration in original). While Plaintiffs' Leases contain the "first arms length purchaser language," the Alternative $.80 Leases do not. (*Id.*)

Rule 23(a)(2) requires a plaintiff to show that "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). This requirement is satisfied so long as the class members "share at least one question of fact or law in common with each other.'" *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004)). It "does not require identical claims or facts among class members." *Marcus*, 687 F.3d at 597 (internal citation and quotation omitted).

At the same time, commonality is not met merely upon a showing that the claims of the class members "depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Therefore, "what matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-32 (2009)).

Plaintiffs need only show "at least one question of law or fact" shared with the putative class members. *Reinig*, 912 F.3d at 127. A determination of whether Range breached the Leases by deducting various post-production costs from the sale price of NGLs in excess of the respective

Caps when calculating and paying royalties, and whether Range has an obligation to pay prejudgment interest on its royalty underpayments would clearly have classwide implications. Thus, the Court finds that commonality has been satisfied. The differences in lease language cited by Range with respect to the "first arms length purchaser" are factual differences insufficient to negate the shared common contentions among Plaintiffs and class members.

### 3. *Typicality*

Range argues that Plaintiffs' claims are not typical of claims under the $.75 Leases. (ECF No. 106 at 23-26.) Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). The typicality requirement "ensur[es] that the class representatives are sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (citations omitted). The Third Circuit has "set a low threshold for satisfying" the typicality requirement. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). As a result, this requirement is satisfied where there is a "strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (internal citation and quotation omitted). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton*, 259 F.3d at 183-84.

Range focuses much of its argument on the notice provision in Plaintiffs' Leases. It argues that because Plaintiffs' Leases are subject to a notice and cure provision and none of the $.75

14

Leases have an applicable provision,[10] Plaintiffs' claims are not typical of the $.75 claims. (*Id.* at 24-25.) Range notes that there are a number of individualized issues regarding the adequacy of Rupert's December 2018 letter that impact Plaintiffs' claims and some of the other putative class members, but not those who hold $.75 Leases.

Plaintiffs counter that the existence of different notice provisions does not defeat certification. It asserts that under Pennsylvania law, a plaintiff can satisfy a pre-suit notice requirement on behalf of an entire class. *Martin, et al. v. Ford Motor Co.,* 765 F. Supp. 2d 673, 683 (E.D. Pa. 2011). Plaintiffs contend that Rupert's December 2018 letter to Range satisfied the notice provision as to all putative class members subject to a notice provision. Assuming the adequacy of the notice for all class members with $.80 Leases, the fact that the $.75 Leases do not require pre-suit notice is a distinction without a difference as this neither creates individualized issues nor renders Plaintiffs' claims atypical.[11] (ECF No. 110 at 22-25.)

The Court concludes that Plaintiffs' claims are typical of the class as they are based on the same legal theory – Range breached the lease provision regarding deduction of post-production costs from royalty payments owed to lessors – and arise out of the same practice or course of conduct – miscalculation of the royalty payments on natural gas, NGLs, and related constituents. *See Marcus*, 687 F.3d at 598 ("If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, factual differences will not render

---

[10] The notice and cure provision in the $.75 Leases applies only when the party seeks to terminate the lease. No pre-suit notice is required.

[11] Range also argues that the $.75 Leases are not typical of the Plaintiffs' Leases because the period of reimbursement is different. This is largely based on its contention that the statute of limitations period for the $.75 Leases is different than the applicable statute for the $.80 Leases because the former is based on the timing of Range's discovery of issues related to the $.75 Leases. As discussed herein, the Court rejects Range's argument.

that claim atypical if it is based on the same legal theory as the claims of the class"). That there are some differences between Plaintiffs' Leases and those of other members of the putative class, such as the notice provision, does not preclude class certification since our Circuit has been clear that "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Wintjen v. Denny's, Inc.*, No. 2:19-CV-00069-CCW, 2021 WL 5370047, at *9 (W.D. Pa. Nov. 18, 2021) (quoting *In re NFL*, 821 F.3d at 428).

Range indicates that it intends to challenge the sufficiency of Rupert's December 2018 letter as class notice. While the Court concludes that it would be premature to determine the adequacy of notice at this juncture, Range may raise this issue at a later point in the proceedings, as appropriate.

Thus, Plaintiffs have satisfied the typicality requirement.

### 4. *Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequate representation depends on two factors: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins.*, 508 F.2d 239, 247 (3d Cir. 1975). Class counsel must be "qualified, experienced, and generally able to conduct the proposed litigation," *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992), and a class representative must "possess the same interest and suffer the same injury as the class members," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997).

16

As to the first factor, lead plaintiffs' counsel, George A. Barton and Stacy Burrows of Barton and Burrows, LLC, are "qualified, experienced, and generally able to conduct the proposed litigation." They have significant experience litigating oil and gas royalty underpayment litigation including class and collective actions. (ECF Nos. 100-26; 100-27.) Further, they have zealously and adequately defended the interests of the putative class. Thus, the Court concludes that they will fairly and adequately represent the class.

With respect to the second factor, Range argues that the named Plaintiffs are not adequate representatives of the proposed class. (ECF No. 106 at 26-27.) It asserts that because none of the named Plaintiffs have a $.75 Lease, they do not have the same alleged injuries with respect to Range's calculation of the reimbursements and associated interest.[12] The $.75 Leases were reimbursed for the production months of June 2018 to May 2022 based on Range's discovery of their miscalculation in June 2022. (*Id.* at 25-26.) Plaintiffs' reimbursements, on the other hand, covered the period from September 2017 to September 2021, with the filing of the class action serving as the trigger date for the four-year statute of limitations.

Plaintiffs argue that "Range's decision to reimburse different members of the Class at different times does not mean that the Class Members who received later reimbursements are subject to differing statutes of limitations." (ECF No. 110 at 26.) The Court agrees.

The filing of a class action tolls the statute of limitations for all putative class members. *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974). Once certified, all members of the class are entitled to the same statute of limitations regardless of when they are identified as part of the class. *Id.* ("[T]he commencement of a class action suspends the applicable statute of limitations as

---

[12] Range also makes this argument with respect to Rule 23's typicality requirement. (ECF No. 106 at 25-26.)

to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.").

Thus, the fact that Range failed to discover issues with the $.75 Leases until July 2022, approximately nine months after Plaintiffs filed their complaint, is irrelevant. The injury is the same across the class, and the applicable classwide statute of limitation spans from September 2017 until September 2021. Any differences in how Range chose to reimburse class members speaks more to damage allocation rather than injury type, which is the relevant issue when analyzing adequacy of representation under Rule 23.

For these reasons, the adequacy of representation element of Rule 23(a) is satisfied.

## C. Rule 23(b)(3) Requirements

Having determined that Plaintiffs established the requirements of Rule 23(a), the Court will now address the requirements of Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The class must also be ascertainable. *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476 (3d Cir. 2020).

### 1. *Predominance*

Range argues that the presence of individualized defenses negates the predominance of common questions. (ECF No. 106 at 21-23.)  It notes all of the $.75 Leases contain an arbitration clause that, according to Range, prevents inclusion of these Lessors in the class.[13] (*Id.* at 21-22.)

_____

[13]  Range also argues that the notice provision in Plaintiffs' Leases and the alleged difference in statute of limitations between Plaintiffs and $.75 Leases also negates predominance. (ECF No. 106 at 22-23.) As

Plaintiffs respond that "[t]he mere existence of an arbitration clause does not mean that the arbitration clause is binding on Class Members and certainly does not preclude class certification." (ECF No. 110 at 16.)

The purpose of the predominance requirement is to ensure that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311, *as amended* (Jan. 16, 2009). *See Reinig*, 912 F.3d at 127 ("Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is far more demanding than the latter") (internal citation and quotation omitted). The key question is "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal citation and quotation omitted). "[A] district court must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove' those elements." *Reinig*, 912 F.3d at 128. Where "'proof of the essential elements of the [claim] requires individual treatment, then class certification is unsuitable.'" *Id.* (quoting *Newton*, 259 F.3d at 172).

The Third Circuit has been steadfast that the focus of the predominance inquiry is on "whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011). Although the presence of individual questions does not defeat

---

these arguments have already been addressed in previous sections, the Court will not revisit them here.

predominance, a plaintiff seeking class certification under Rule 23(b)(3) must demonstrate that common answers outweigh individual questions. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015); *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, No. 20-3528, 2021 WL 3612155, at *3 (3d Cir. Aug. 16, 2021) (internal citation omitted) ("Predominance also does not require that common questions will be answered, on the merits, in favor of the class . . . but it does require that the common issues will generate common answers").

Out of the two hundred four leases at issue, fifty-four leases contain some type of arbitration provision, including all thirty-one of the $.75 Leases.[14] The existence of an arbitration clause in a minority percentage of unnamed class member leases is insufficient, by itself, to defeat class certification. *Salvatora*, 2023 WL 4137306, at *17; *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*, 2016 WL 5508843, at *2 (D.N.J. Sept. 28, 2016). "As long as 'one or more of the central issues in the action are common to the class and can be said to predominate,' the requirement is satisfied, even if 'other important matters will have to be tried separately, such as damages or some other affirmative defense peculiar to some individual class members.'" *Slamon v. Carrizo (Marcellus) LLC*, 2020 U.S. Dist. LEXIS 87149, at *50 (M.D. Pa. May 18, 2020).

Thus, the fact that a minority percentage of the class leases contain arbitration clauses does not negate predominance. None of the Plaintiffs' Leases have an arbitration clause, and since only a minority of the leases include any provision about arbitration, this will not be a "major focus of the litigation." *Salvatora*, 2023 WL 4137306, at *16 (quoting *Marcus*, 687 F.3d at 598). Moreover, the class definition excludes those lessors whose lease includes a binding arbitration

---

[14]  This represents about 26% of the class leases.

provision. In the event that Range moves to compel arbitration post-certification, the interpretation of the various arbitration provisions, including whether one or more are binding, can be resolved through briefing, and as necessary, the class composition can be modified. Thus, the Court concludes that whether those minority leases with arbitration provisions should be included in the class is best determined after certification.

To prevail on their breach claim under Pennsylvania law, Plaintiffs and the putative class must demonstrate the existence of a contract, a breach of that contract, and damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). The relevant evidence in the record consists of Plaintiffs' Leases, Plaintiffs' royalty statements, Gas Processing Agreements between Range and its marketing agent MarkWest, hundreds of pages of documentation produced by Range relating to the admittedly common method of royalty accounting in its calculation of royalties paid to Plaintiffs and the class members, as well as declarations and deposition testimony from Range's corporate designees. Plaintiffs contend that this evidence "shows that all of the issues regarding Range's liability under the 205 Class Leases revolve around common issues of fact and law, and that the putative Class Members' damages can be calculated using the royalty payment detail produced by Range in this case and by using the data provided by MarkWest each month." (ECF No. 102 at 26.) Given these facts, the proposed class's breach of contract claim is "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Reinig*, 912 F.3d at 127-28 (quoting *Gonzalez*, 885 F.3d at 195).

In so finding, the Court expresses no opinion on the ultimate merits of Plaintiffs' claim. Whether any of the leaseholders are entitled to recovery is an issue that remains to be resolved at

a later point in these proceedings. *See Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 322 (3d Cir. 2016) ("Although the court must undertake a rigorous analysis at the certification stage and consider some merits-related issues, the class certification stage is not the place for a decision on the merits"). Nevertheless, the Court concludes at this time that a decision on the merits can be resolved on a classwide basis.

### 2. *Superiority*

Rule 23(b)(3) requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy" and provides a non-exhaustive list of factors to consider. Fed. R. Civ. P. 23(b)(3). These include: the class members' interest in individually controlling litigation; the extent and nature of any litigation; the desirability or undesirability of concentrating the litigation; and the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiffs argue that a class action is the superior method for litigating these claims and suggests that courts have routinely granted class certification in similar cases. (ECF No. 102 at 26-28.) In turn, Range asserts that a class action is not superior with respect to the $.75 Leases because all of them are subject to an arbitration clause. Thus, Range argues that arbitration, rather than class action, is the superior method of adjudication. (ECF No. 106 at 27-28.)

However, "[a]ny individual issues can be managed within a class action." *Salvatora*, 2023 WL 4137306, at *20. As stated above, the injuries alleged by Plaintiffs and the putative class members arise from the same alleged conduct. Adjudication as a class action can resolve the common issues that predominate as to all class leases at one time rather than requiring the expenditure of extra time and expense to generate individual decisions among similarly situated

individuals. *See Eaton v. Ascent Res. - Utica, LLC*, 2021 U.S. Dist. LEXIS 145585, at *42 (S.D. Ohio Aug. 4, 2021) ("The benefit of avoiding this scenario is twofold. First, it will cut down on costs for the litigants and the judiciary. Second, it will avoid the possibility of inconsistent results.") Class treatment thereby promotes efficiency for both the parties and the Court. Plaintiffs have therefore satisfied Rule 23(b)'s superiority requirement.

### 3. *Ascertainability*

A Rule 23(b)(3) class must be "currently and readily ascertainable based on objective criteria." *Hargrove*, 974 F.3d at 477 (quoting *Marcus*, 687 F.3d at 593). A plaintiff need not "be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified.'" *Id.* (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)). In order to demonstrate this, a plaintiff must show "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* at 476 (quoting *Byrd*, 784 F.3d at 163).

Range does not dispute that the proposed class is ascertainable. Indeed, the proposed class is defined using objective criteria – i.e., lessors to whom Range has paid royalties on the production of NGLs since September 1, 2017 subject to a $0.80, $0.75, or $0.72 Cap on the deduction of post-production costs. Further, because Range itself was able to self-review its past business records to identify oil and gas leases that fit the proposed class definition, it is clear that putative class members are easily identifiable. Thus, the ascertainability requirement is satisfied here.

**V.**      <u>**Conclusion**</u>

Having found that the requirements of Rule 23(a) and Rule 23(b)(3) are met and that the

class is ascertainable, Plaintiff's Motion for Class Certification (ECF No. 100) will be granted.

An appropriate order will follow.


Dated:   September 30, 2024                        /s/ Patricia L. Dodge
                                                   PATRICIA L. DODGE
                                                   United States Magistrate Judge